[No. 3347.]

## James Bailey v. The State.

1. Theft — Consent — Indictment.— The common law doctrine that an indictment for theft need not allege, nor the proof show, the owner's want of consent to the taking, does not obtain in this State. At common law the evidence which establishes the *corpus delicti* shows a fraudulent taking. In this State all offenses are statutory, and an indictment, to be sufficient, must follow the language of the statute, or employ language of similar or greater import. An indictment for theft, therefore, must allege that the property was taken from the possession of some one; that such taking was without the consent of such person; and these allegations must be sustained by proof.

2. Same — Ownership.— Indictments for theft, in charging the ownership and possession of the alleged stolen property, are controlled by the facts in the particular case. If one person owns the property and another has the possession of the same, it will be sufficient to allege that the property was taken from the possession of the latter, who was holding the same for the owner; but in such case the indictment should allege the non-consent of both, and the proof must support the allegation.

3. SAME — CONSTRUCTION OF A TERM.— To constitute "possession" within the meaning of the Code, the party must, at the time of the taking, have the actual care, control or management of the property. Possession and custody are not synonymous or convertible terms, and if the property at the time it is taken be in the mere temporary custody of a ward, servant or other person, the indictment need not allege the possession to be in such temporary custodian.

4. SAME.— Article 426 of the Code of Criminal Procedure provides: "If one person owns the property, and another person has the possession, charge or control of the same, the ownership thereof may be alleged to be in either." An indictment, therefore, which alleges the ownership and non-consent of the actual owner should also allege the non-consent of the special owner. But if it alleges only the possession of the special owner, and that the property was taken from his possession without his consent, it need not allege the possession of the actual owner, nor negative his consent to the taking. See the opinion *in extenso* on the question.

5. SAME — CASE STATED.— The indictment in this case alleged that the animal stolen was the property of J. D., and that it was taken without his consent. The proof showed that it was taken while in casual use of T. D., the minor son of the alleged owner. The State proved the non-consent of both J. D. and his minor son. The objection insisted upon is that the court erred in permitting the State to prove the minor son's non-consent. *Held*, that the minor son's connection with the stolen animal was that of a mere temporary custodian; that it was not necessary to allege either that the property was taken from his possession or that it was taken without his consent, but that the proof of his non-consent could not have prejudiced the rights of the accused, and therefore its admission was of no consequence.

APPEAL from the District Court of Collin. Tried below before the Hon. R. Maltbie.

The conviction was for the theft of a horse, the property of John Douglass, in Collin county, Texas, on the 28th day of August, 1884. A term of eight years in the penitentiary was the penalty assessed by the verdict. Charles Miller was charged in the same indictment, but was not upon trial.

John H. Douglass was the first witness for the State. He testified that he lived in Collin county, five miles north of Farmersville. He did not know the defendant, and saw him for the first time at his examining trial. Witness described the horse mentioned in the indictment, and deposed that said animal, a mare, belonged to him and was taken without his consent. Witness searched through Collin, Hill, Johnson and Tarrant counties, but failed to recover the mare. The arbor from which she was supposed to have been taken on the night of August 28, 1884, was about three miles distant from witness's house.

Cross-examined, the witness stated that his son, nineteen years old, commonly called "Tip" Douglass, rode the mare to church at

the arbor mentioned, on the night of August 28, 1884. Tip lived at the witness's house, and the mare, when taken, was in witness's possession. Witness was not at the arbor on that night.

J. E. Bunkley testified, for the State, that he saw the defendant and a young man who was called Charles Miller at his, witness's, stable in Farmersville, at noon on the day before the alleged theft. They wanted to hire a couple of horses for a day or two. Defendant said that his name was Bailey, and that he and Miller wanted to go ten or twelve miles into the country to see his uncle named Bailey. Witness refused to hire them horses, and afterwards heard them ask permission of Bybee to ride out in his wagon. Witness next saw them about 9 o'clock on the following night, about two and a half miles north of Farmersville. They were riding black or bay horses. Witness heard of the theft next day about noon. He had not since seen the man Miller.

Cross-examined, the witness said that, when at his stable on the day before the theft, defendant was in his shirt sleeves, and wore a striped shirt and a white hat with leather band. He wore a brown mustache. Miller was a low, slender, pale-faced young man. The moon rose about dark on the next night, and when the two men passed the witness that night he recognized them by their general appearance. He could see that defendant was in his shirt sleeves and had on a white hat, but could not tell whether they rode horses or mares.

Hugh Woody testified, for the State, that he had known defendant for two years. Defendant, wearing no coat, but a striped shirt, ducking pants, and a white or yellow hat with a leather band, and Miller, a younger and smaller man, came to the witness's house, about five and a half miles distant from Farmersville, on the evening of August 27, 1884, and remained over night. They said they came from Hill county, hunting work. They left after breakfast next morning, saying they were going to Farmersville and there take the train back to Hill county. They came and went on foot.

Michael Sumner testified, for the State, that he had known the defendant about two years. The defendant and Miller came to his house from Woody's, on the morning of August 28, 1884. As they were leaving (being on foot), defendant said to Miller: " Come on; we have about fifty miles to walk." Witness asked him where he was going, and he said to McKinney. Witness then told him that it was not far to McKinney. Defendant replied: " It will seem so to us when we get there through the black mud." Witness lived about a half a mile from Woody's and two miles or more from the arbor

spoken of by the witness Douglass. Defendant and Miller were on foot when witness saw them.

J. R. Cornelius testified, for the State, that he first saw the defendant at Thorp's house in February, 1884. Witness there heard him say to some one that he had come there to buy a horse. Witness next saw him in company with a young man called Miller, on August 28, 1884, at witness's house, near Vance's Gin, and near the arbor where the meeting was in progress. They were on foot. Nothing was said by either witness or defendant about their previous meeting. The two men talked with witness about ten minutes, saying that they were going to Bonham to pick cotton, and asked for directions to that point. They also asked the way to the arbor where preaching was going on.

John D. Murchison testified that he first saw the defendant and another man near and going towards the arbor on the night of the alleged theft. He next saw defendant near the same place, but nearer a pair of scales, twenty or thirty minutes later, and had some talk with him. Defendant said that he was going south. Witness left defendant and Miller going to the arbor. Defendant and Miller went towards the road. Tip Douglass rode the mare alleged to have been stolen, to the arbor that night, and hitched her to a fence on the side of the road, about thirty or forty yards from the scales. Witness had never before seen the defendant.

Zeb Sumner testified, for the State, that he was sixteen years old. He saw defendant and Miller at his father's house on the morning of August 28, 1884. Witness was at preaching at the arbor on the night of that day. He was perfectly familiar with Douglass's mare, and saw her that night. She was then ridden past the witness, who stood on the scales, by the defendant. Miller, on another horse, was with him. They rode off in a trot, but soon increased their speed to a lope.

The cross-examination of this witness disclosed the fact that he told no one that night of what he saw, and that, after it was next day announced at a baptizing that Douglass had lost his mare, he told no one but his mother. He would not swear positively that the animal ridden off by the defendant that night was Douglass's mare, but fully believed it was, and he was quite familiar with that animal.

Tip Douglass testified, for the State, that he rode the mare in question to the meeting on the night of the theft, and hitched her to the fence south of the scales. She was taken without the witness's consent.

Mr. Andrews testified, for the State, that he reached the arbor about 8 o'clock on the night of the theft. Preaching was over when he arrived, and the mourners were being called. Witness traveled north in going to the arbor. Witness met two persons riding dark colored animals, about one mile south from the arbor. They were traveling in a brisk trot. One had on a white hat, and the other was in his shirt sleeves or wore a light colored coat. He could not tell the ages of those persons, and was not acquainted with either defendant or Miller.

J. P. Seigler testified, for the State, that he first saw the defendant after his arrest. Witness was not at the arbor on the night of the theft. He searched through Collin, Hill, Johnson, Tarrant and Hunt counties for the horses. Witness's was an unbranded horse, past two years old, but, being flop-eared, looked like an old horse. Witness in October, 1884, heard of the horses at Brown's in Tarrant county, through Mr. Stewart, the brother of the witness of that name.

A. J. Stewart next testified, for the State, that he lived about a mile and a half from Mansfield, in Tarrant county. He saw defendant and Charley Miller at West Brown's house, in Tarrant county, about the last of August or the first of September, 1884. They had with them a nice bay mare from three to five years old, and an aged, large black horse. Witness noticed nothing very peculiar about the ears or head of the black horse. Both animals seemed considerably jaded. Miller did not say where he and defendant got the horses. Miller and West Brown were brothers-in-law. Witness took the black to be an aged horse. He looked old and flop-eared. Witness did not notice for brands on the mare.

The motion for new trial raised the question discussed in the opinion.

No brief for the appellant has reached the Reporters.

J. H. Burts, Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for the theft of a horse, the property of John Douglass. On the night of the 28th of August, 1884, there was preaching at an arbor which was situated about three miles from the residence of John Douglass. On that night Tip Douglass rode the mare to the arbor at which there was preaching. Tip was about nineteen years old, and at the time lived with his father. The indictment alleged that the mare was the property of John Douglass, and that the same was taken without his consent.

Upon the trial the State, over the objections of the defendant, proved by Tip that *he* had not given his consent to the taking. This is assigned for error, and for this supposed error the defendant asks that the judgment be reversed.

It was in proof that John Douglass did not consent to the taking. This being the case, was it error for the State to prove that Tip did not consent to the taking? We cannot perceive how defendant could possibly be injured by the proof, unless the facts were of such a character as to render it necessary for the State to prove that *Tip Douglass did not consent* to the taking of the mare. Hence we are led to a discussion of a question which lies back of this, and which is this: Under the facts of this case, was it required of the State to allege that the property was taken from the possession and without the consent of *Tip Douglass?*

At common law, as defined by Mr. Blackstone, larceny is "the felonious taking and carrying away of the personal goods of another" (4 Bl. Com., 229), and for this offense the following form of indictment is held sufficient: That John Smith, late of, etc., in the county of Travis, three pairs of shirts of the value of nineteen shillings, of the goods and chattels of one John Brown then and there being found, feloniously *did* steal, take and carry away, against the peace and dignity of our lady the queen, her crown and dignity.

It will be observed that in this form there is no allegation that the property was taken from the possession of the owner, or that it was taken without his consent, or that the taking was with the intent to deprive the owner of the value of the property, and to appropriate the same to the taker's use or benefit.

Upon a trial for larceny at common law, the prosecution was not required to prove that the owner did not consent to the taking. Such proof was made indirectly by the evidence which went to establish the *corpus delicti,*— merely that the property had been feloniously taken by some person. Bearing, therefore, upon the *animus furandi*, all of the facts and circumstances were looked to. Did the person commit a trespass by taking the property of another without authority? Was it his intention to permanently deprive the owner of the property, and to make the same his own? These questions were all looked to and considered in order to determine whether the *taking was felonious.* And if in fact the prisoner had permission of the owner, or if he took the property through mistake, or upon an honest claim, the State first having made a case against him, he was held to make proof of these facts.

In this State horse theft being a statutory offense, as are all other

offenses, the indictment must follow the language of the statute, or use language of greater or similar import; and hence it must allege that the property was taken from the possession of some person, and that this taking of the property was without the consent of such person; and these facts must be proved.

In whom must ownership and possession be alleged? This, of course, depends upon the facts of the case. If one person owned the property, and another had the possession thereof, an indictment which alleged that the property was taken from the possession of the latter, who was holding the same for the owner, and which alleged the property in the former, would be good. But in such an indictment the consent of each must be denied, and these allegations must be proved.

But suppose that the servant or minor son of the owner has merely the custody of the property, or that any other person has merely the custody of the property, must of necessity the indictment allege the possession to be in such servant, minor or other person? We think not. To constitute possession in the meaning of our Code the party must at the time be in the exercise of actual control, care or management of the property. (Penal Code, art. 729.)

Now, under article 426, Code Crim. Procedure: "If one person owns the property and another person has the possession, charge or control of the same, the ownership thereof may be alleged to be in either." But, let us suppose that A. owns the property, and that B. has the possession, charge or control of the same when taken, and that the indictment alleges that the property belongs to A. and that the same was taken from his possession, without his consent, would it be necessary under the above state of facts for the indictment to charge that the property was also taken from the possession of B., without his consent? We think so, for the very plain reason that the facts must correspond with the allegations of the indictment. In the supposed indictment it is alleged that the property was taken from the possession of A. This, however, would be false; for, when taken, B. had the possession of the property. Again, let us take the same state of facts, and let us suppose that the property belonged to B., and that the same was taken from his possession, without his consent, would it be required of the indictment to go further and allege that the property was taken from the possession of A., without his consent? We think not; because the Code declares that he who has the possession, charge or control of property is, for the purposes of criminal pleadings, the owner of such property. B. being in law the owner of the property because he has the possession, care

or control of the same, the indictment charging him to be such would in this respect be true, and the allegation that it was taken from his possession would also be in strict accord with the facts, and would also be true.

Our conclusion is that when property is in the possession, care or control of a certain person, but belongs to another when taken, the indictment must allege that such person was the owner thereof, and that the same was taken from his possession, without his consent. And if (which is not necessary) the indictment should allege property, possession and want of consent of the actual owner, still it must go further and allege the facts that it was taken from the possession of the party who had the possession, care or control of the property, and that it was taken without such person's consent.

But, on the other hand, when a party has the possession, care or control of the property of another, if the indictment should allege such party to be the owner, and that it was taken from his possession, without his consent, the indictment need go no farther. It would be sufficient on these facts without any mention whatever of the actual owner. Nor under such an indictment would it be required of the State to prove the want of consent of the actual owner. This question is one of pleading, not of proof. Of course, as a general rule, if facts must be alleged they must be proved. But we are discussing the subject of when facts must be alleged; let us settle this, and the question of what proof must be made is of easy solution.

In the case in hand we hold that Tip Douglass was simply the servant of John Douglass; that he did not have the possession, care or control of the mare, but that she was merely in his custody. This being the case, it was not necessary for the indictment to allege that the property was taken from his possession, without his consent. In fact it was not necessary for him to be mentioned in the indictment at all.

We have found no error in the judgment and it is affirmed.

*Affirmed.*

[Opinion delivered May 16, 1885.]

[REPORTERS' NOTE.— Published in the regular order of its decision, the report of this case would have appeared at a previous page of this volume. But the reference to it in the opinion in the following case of *Frazier*, alias *Robinson*, v. *The State*, suggests that it shall immediately precede that case.]